Filed 10/9/14  Safarian v. Shaham CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ROSE SAFARIAN et al, <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> ELSAGAV S. SHAHAM, M.D., <br><br> Defendant and Appellant. | B244709 <br><br> (Los Angeles County <br> Super. Ct. No. BC387615) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ernest Hiroshige, Judge.  Affirmed.

Elsagav Shaham, M.D., in pro. per.; The Maloney Firm, Patrick M. Maloney; Klapach & Klapach and Joseph S. Klapach for Defendant and Appellant.

Law Offices of Armen M. Tashjian, Armen M. Tashjian for Plaintiffs and Respondents Rose Safarian and Armen Sanamyan.

# INTRODUCTION

A jury found that defendant and appellant Elsagav Shaham, M.D. (Shaham) and defendants Harry Govgassian (Govgassian), Alisa Agadjanian (Agadjanian), and Silka Enterprises Inc., doing business as Salud Family Medical Clinic (Silka/Salud) conspired to defraud plaintiffs and respondents Rose Safarian (Safarian) and her husband Armen Sanamyan (Sanamyan) (plaintiffs) in connection with plaintiffs' investment in a medical clinic. The jury awarded plaintiffs compensatory and punitive damages. On appeal, Shaham[1] contends that the trial court improperly and prejudicially instructed the jury on conspiracy to commit fraud because plaintiffs' second amended complaint did not allege that he participated in a conspiracy to commit fraud, the evidence did not support such an instruction, and the instruction misstated the law; sufficient evidence did not support his inclusion on the conspiracy to commit fraud special verdict form; the trial court erroneously admitted evidence; Govgassian's, Agadjanian's, and plaintiffs' perjured testimony denied him a fair trial and caused him to suffer an excessive damages award; his counsel's joint representation of Govgassian and Agadjanian despite a conflict denied him a fair trial; and the trial court erred when it denied his new trial motion on the grounds that he did not timely file his notice of intention to file a new trial motion and his new trial motion. We affirm.

---

[1] Govgassian and Agadjanian filed notices of appeal separate from Shaham. Their appeals were dismissed. This opinion concerns only Shaham's appeal.

# BACKGROUND[2]

Plaintiffs alleged in their second amended complaint that Shaham was the sole stock owner in Silka/Salud, a medical clinic located on Santa Monica Boulevard in Los Angeles.  Govgassian owned, and he and Agadjanian were the managers and executives of, defendant Hippocratic Management Services, Inc. (Hippocratic).[3]  Govgassian was Safarian's trusted long-time family friend.  On April 18, 2007, plaintiffs finalized a verbal agreement to enter a joint venture or partnership with Govgassian and Agadjanian for the purchase of a one-third interest in Silka/Salud for $150,000.

Under the terms of the verbal agreement, plaintiffs alleged, Shaham would retain a one-third interest in Silka/Salud and Govgassian and Agadjanian would receive a one-third interest.  The agreement also provided that plaintiffs would have full operational and executive management control of the medical clinic; the clinic would employ Safarian as a Comprehensive Perinatal Services Consultant (CPSC) and a nutritional consultant; defendants would work diligently to obtain "all proper licensing and permits," including obtaining a "provider number" and an accreditation to do business with Medicare and Medicaid, to enable the clinic to open; "[d]efendants, having represented to the plaintiffs that the subject corporation was/is well capitalized, will be able to meet all of its obligations and liabilities while defendants are in a process of obtaining" all proper licensing and permits; defendants would market the clinic; and defendants would not act against the clinic's financial interests.

---

[2]     Shaham opening brief does not include an adequate statement of the facts.  (Cal. Rules of Court, rule 8.204(a)(2)(c)  (2) ["An appellant's opening brief must:  [¶]—[¶] Provide a summary of the significant facts limited to matters in the record"].)  Plaintiffs' brief also does not contain an adequate statement of facts.  We summarize here the relevant allegations in plaintiffs' second amended complaint and set forth some of the procedural background to place Shaham's contentions on appeal in context.  As necessary, we set forth additional facts in our discussion below of Shaham's contentions on appeal.

[3]     The trial court struck Hippocratic's answer and entered its default.

3

Plaintiffs alleged that Govgassian and Agadjanian falsely stated to them that "Silka/Salud was a well-financed corporation with a successful track record and imminent profits from ventures in the health care industry" in order to induce them to purchase the interest in Silka/Salud.  With Shaham's "full authority, knowledge and consent," Govgassian and Agadjanian also made the following false and misleading statements to plaintiffs:[4]  plaintiffs would be issued one-third of Silka/Salud's common stock, the fair market value of which was $150,000; as one-third owners of Silka/Salud, plaintiffs would receive substantial income once Silka/Salud obtained a "provider number" to bill Medicare and Medicaid for services rendered to its patients; Silka/Salud would employ Safarian as an administrator, and she would participate in profit sharing; plaintiffs would be kept well informed of the progress of the accreditation process; plaintiffs would be allowed to "inspect [the] books" and would be "provide[d] accounting without restrictions"; plaintiffs would receive their share of the profits at least on a quarterly basis; and plaintiffs would have unrestricted access to Silka/Salud's records without "special notice requirements."  Plaintiffs relied on the false and misleading statements in investing in Silka/Salud.

According to plaintiffs, subsequent to their initial investment in Silka/Salud, they were "forced" to lend Silka/Salud $95,000 due to its "severe undercapitalization."  To raise the $95,000, plaintiffs had to deplete their savings and borrow against their credit cards.  Defendants breached the agreement in a number of ways, ran the clinic in an illegal manner, and fired Safarian when she complained about illegal billing without ever having paid her wages.

In their second amended complaint, plaintiffs asserted against Shaham, Govgassian, Agadjanian, Silka/Salud, and Hippocratic causes of action for unlawful sale of securities, constructive fraud, breach of contract, breach of fiduciary duty, conversion, accounting, declaratory relief, and unlawful business practices in violation of Business and Professions Code section 17200.  Plaintiffs alleged in their fraud cause of action—the

---

[4]     The trial court found that Shaham did not personally make a false representation to plaintiffs.

4

only cause of action ultimately presented to the jury—that Govgassian and Agadjanian made false promises and representations to them about Silka/Salud's current financial viability and future financial prospects thereby inducing them to purchase a one-third interest in the medical clinic. They alleged that Shaham, as the sole owner and operator of Silka/Salud, "was well aware of the promises made to plaintiffs" and "knowingly and voluntarily accepted the benefits of the transaction." Plaintiffs alleged that they suffered damages as a result of the false representations. Plaintiffs also asserted against Govgassian a cause of action for intentional infliction of emotional distress. In addition to compensatory damages and other relief, plaintiffs sought punitive damages.

After the presentation of plaintiffs' evidence, Shaham, Govgassian, and Agadjanian apparently moved for nonsuit as to all causes of action in the second amended complaint.[5] Before the trial court ruled on the motion, plaintiffs stated that they were willing to proceed only on their causes of action for fraud, conversion, and intentional infliction of emotional distress. Thereafter, the trial court granted nonsuit as to plaintiffs' conversion and intentional infliction of emotional distress causes of action, and denied nonsuit as to plaintiffs' fraud cause of action, which cause of action the trial court permitted plaintiffs to argue to the jury on a conspiracy to commit fraud theory of liability.

On the special verdict form on conspiracy to commit fraud, the jury found that a defendant made a false representation to a plaintiff that the defendant knew was false or made the representation recklessly and without regard for its truth. It further found that the following four representations were false: 1. "Per Harry Govgassian and/or Alisa Agadjanian defendant corporations were well-financed with successful track record and imminent profits from ventures in the health care industry, and were able to meet all of their financial obligations and liabilities while defendants were in the process of obtaining licensing and provider number"; 2. "Per Harry Govgassian and/or Alisa Agadjanian Plaintiffs for investing $150,000.00 would own one-third interest of medical

---

[5]     Shaham did not designate the motion for nonsuit as part of the record on appeal.

5

clinic called Silka Enterprises, Inc., d/b/a Salud Family Medical Clinic"; 3. "Per Harry Govgassian and/or Alisa Agadjanian Plaintiff Rose Safarian would be paid $25.00 per hour as the on-site manager and CPS[C] consultant"; and 4. "Prior to investing the Plaintiffs were promised by Harry Govgassian and/or Alisa Agadjanian that they would safeguard their investment and will give them detailed accounting and documentation of how their investment was being utilized." The jury found that plaintiffs "reasonably relied on the representation" and that reliance on the false representation was a substantial factor in causing harm to plaintiffs. It found that Shaham, Govgassian, Agadjanian, and "Silka Enterprises/Hippocratic" conspired to defraud plaintiffs. The jury awarded plaintiffs compensatory damages of $460,000 against Shaham, Govgassian, Agadjanian, and Silka/Salud; and punitive damages of $100,000 against Shaham, $250,000 against Govgassian, $125,000 against Agadjanian, and $25,000 against Silka/Salud.

## DISCUSSION

### I.     Conspiracy to Commit Fraud

Shaham contends that the jury was improperly instructed on conspiracy to commit fraud as to him because the second amended complaint did not allege that he participated in the formation and operation of a conspiracy to commit fraud; CACI No. 3600, the instruction on conspiracy to commit fraud, misstated the law because it failed to state that a defendant had to intend to aid in the commission of the wrongdoing to be a coconspirator; he was prejudiced by the conspiracy to commit fraud instruction because the evidence did not show that he participated in the formation and operation of a conspiracy to commit fraud; and the special verdict form on conspiracy to commit fraud allowed the jury to find him liable when the evidence did not show that he participated in a conspiracy to commit fraud. The trial court did not err in instructing the jury on conspiracy to commit fraud or in giving the jury the special verdict form on conspiracy to commit fraud and there was sufficient evidence to support the instruction and verdict.

6

A.	*Conspiracy to Commit Fraud Allegations in the Second Amended Complaint*

Shaham contends that the trial court erred in instructing the jury with CACI No. 3600 on conspiracy to commit fraud as to him because the second amended complaint did not allege that he participated in the formation and operation of a conspiracy to commit fraud. The second amended complaint sufficiently alleged that Shaham participated in a conspiracy to commit fraud.

"Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.] By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. [Citation.] In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511.)

"The elements of an action for civil conspiracy are (1) formation and operation of the conspiracy and (2) damage resulting to plaintiff (3) from a wrongful act done in furtherance of the common design. (*Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39, 44.)" (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1062.) A plaintiff need not allege in detail the acts that constitute the conspiracy. (*Greenwood v. Mooradian* (1955) 137 Cal.App.2d 532, 537-538.) "[B]ecause of the inherent difficulty in proving a conspiracy, it has been held that a conspiracy may sometimes be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances." (*Id.* at p. 538.)

Plaintiffs in the fraud cause of action[6] against all of the defendants in the second amended complaint alleged that Govgassian and Agadjanian made false promises and representations to plaintiffs about Silka/Salud's current financial viability and future financial prospects thereby inducing them to purchase a one-third interest in the medical

---

[6]	In the heading, plaintiffs allege "constructive fraud." The allegations, however, determine whether a cause of action is stated.

7

clinic. Plaintiffs alleged that Shaham, as the sole owner and operator of Silka/Salud, "was well aware of the promises made to plaintiffs" and "knowingly and voluntarily accepted the benefits of the transaction." Plaintiffs suffered damages as a result of the false representations. In addition, plaintiffs alleged that each defendant acted as an agent for each other and approved and ratified the acts of each of the other defendants. Although the fraud cause of action does not use the word "conspiracy" in its allegations, by inference it alleged sufficiently each of the elements of a conspiracy to commit fraud. (*Rusheen v. Cohen, supra,* 37 Cal.4th at p. 1062; see also *Farr v. Bramblett* (1955) 132 Cal.App.2d 36, 47 [do not have to use word "conspiracy" in allegations to state a cause of action for conspiracy][7], disapproved on another ground in *Field Research Corp. v. Superior Court* (1969) 71 Cal.2d 110, 114, fn. 4.)

### B. The Conspiracy to Commit Fraud Instruction (CACI No. 3600)

Shaham claims that the trial court erred in instructing the jury with CACI No. 3600 on conspiracy to commit fraud because the instruction misstated the law by failing to inform the jury that a defendant had to intend to aid in the commission of the wrongdoing to be a coconspirator. The trial court properly instructed the jury on conspiracy to commit fraud. We review de novo a claim that a jury instruction does not correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

The trial court instructed the jury with a modified version of CACI No. 3600 as follows:

"Plaintiffs claim that they were harmed by a fraud and that Harry Govgassian, Alisa Agadjanian, Elsagav Shaham, M.D. and SILKA ENTERPRISES INC. are responsible for the harm because they were part of a conspiracy to commit fraud. A conspiracy is an agreement by two or more persons to commit a wrongful act. Such an agreement may be made orally or in writing or may be implied by the conduct of the parties. All members of a conspiracy are referred [to] as 'co-conspirators'.

---

[7] Shaham acknowledged prior to trial that plaintiffs' action against him sought to hold him personally liable for the acts of Govgassian and Agadjanian.

8

"If you find that any co-conspirator committed a fraud that harmed Rose Safarian and Armen Sanamyan, then you must determine whether other defendants are also responsible for the harm.  A defendant is responsible if Rose Safarian and Armen Sanamyan prove both of the following:

"1.  That the defendant was aware that at least one co-conspirator planned to commit fraud; and

"2.  That the defendant agreed with and intended that the co-conspirator commit the fraud.

"Mere knowledge of a wrongful act without cooperation or an agreement to cooperate is insufficient to make a defendant responsible for the harm.

"A conspiracy may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and the interests of the alleged co-conspirators.  Rose Safarian and Armen Sanamyan are not required to prove that each defendant personally committed a wrongful act or that each defendant knew all the details of the agreement or the identities of all the other participants."

Citing *Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1583, Shaham argues that CACI No. 3600's requirement that plaintiff prove "[t]hat the defendant agreed with and intended that the co-conspirator commit fraud" misstated the law because the law requires that a "co-conspirator intend to aid in the commission of the wrongdoing, which is more active than the passive requirement of intend for it to be committed." [8]  CACI No. 3600 does not misstate the law.  To be liable for a civil conspiracy, a defendant does not personally have to commit the tort that is the object of the conspiracy.  (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra,* 7 Cal.4th at p. 510.)  Instead, a defendant is liable as coconspirator because he shares with those committing the tort a common plan or design in the tort's perpetration.  (*Id.* at pp. 510-

---

[8]    It appears that Shaham intended to cite to page 1582 rather than page 1583 of *Kidron v. Movie Acquisition Corp.* where the court held that "actual knowledge of the planned tort, without more, is insufficient to serve as the basis for a conspiracy claim. Knowledge of the planned tort must be combined with intent to aid in its commission."

511.) Accordingly, because a defendant does not have to commit the tort personally to be liable as a coconspirator, he does not have to intend to aid in its commission. Rather, because a defendant is liable by sharing with the actual tortfeasors a common plan or design in the tort's perpetration, the defendant need only "intend[] that the co-conspirator commit fraud." (CACI No. 3600.) Moreover, CACI No. 3600 specifically informed the jury that Shaham's knowledge of the conspiracy alone was insufficient to find him liable as a coconspirator.

### C. Sufficiency of the Evidence in Support of CACI No. 3600 and the Special Verdict Form on Conspiracy to Commit Fraud

Shaham contends that the trial court prejudicially instructed the jury with CACI No. 3600 on conspiracy to commit fraud when the evidence did not show that he participated in the formation and operation of a conspiracy to commit fraud. He further contends that because the evidence did not show that he participated in a conspiracy to commit fraud, the trial court erred in giving the jury the special verdict form on conspiracy to commit fraud. We asked the parties to submit supplemental briefs addressing whether Shaham forfeited these contentions by failing to summarize the facts in support of the judgment fully and fairly. (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [judgment]; *Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218 [jurisdictional finding]; *First American Title Co. v. Mirzaian* (2003) 108 Cal.App.4th 956, 958, fn. 1 ["A party proceeding in propria persona 'is to be treated like any other party and is entitled to the same, but no greater consideration than other litigants and attorneys.' [Citation.]"].) Regardless of any such forfeiture, we directed plaintiffs to specify the evidence they claim shows that Shaham participated in a conspiracy to defraud them, and directed Shaham to analyze the evidence to show he did not participate in such a conspiracy.

Despite Shaham's initial failure to set forth the facts properly, we have reviewed the record (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 739 [the burden to provide a fair summary of the evidence "grows with the complexity of the

10

record"]) and conclude that sufficient evidence supports the instructions on conspiracy to commit fraud and the jury's finding that Shaham conspired to defraud plaintiffs.

Proving a conspiracy is inherently difficult. (*Greenwood v. Mooradian, supra,* 137 Cal.App.2d at p. 538.) Here, because Shaham did not personally make a false representation to plaintiffs, plaintiffs' task of proving his involvement in a conspiracy to defraud them was more difficult. Plaintiffs had to prove that Shaham conspired to defraud them by inference "from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances." (*Ibid.*)

Shaham testified that he met Govgassian and Agadjanian in 1998 or 1999 when he was hired as an obstetrician at the Salud Clinic on Sunset Boulevard. "Salud" was the business name of Silka Enterprises, Inc. In 2001, when the other physicians left the clinic, Govgassian and Agadjanian approached Shaham about acquiring the clinic. Shaham either paid $1 for the clinic or Govgassian gave him the clinic. Shaham changed Silka Enterprises, Inc. from a "regular" corporation into a medical corporation. Shaham owned 100 percent of Silka Enterprises, Inc. Shaham made all the decisions "as far as the corporation [was] concerned." Govgassian managed the clinic for Shaham. Agadjanian was the office manager.

In about 2007, Govgassian told Shaham that he, Govgassian, was going to open a second clinic on Santa Monica Boulevard. Shaham testified that he did not want anything to do with the second clinic and that he told Govgassian not to use Silka Enterprises, Inc. funds in opening the second clinic. Asked if Govgassian opened the clinic despite Shaham's opposition, Shaham responded, "If he wants to set up a business and be a manager there. It's his business, who am I to stop him."

Safarian testified that she and Sanamyan had numerous discussions with Govgassian, a long-time family friend, and Agadjanian about investing in the Santa Monica clinic. Shaham was not physically present for those discussions, but if Safarian or Sanamyan had any questions, Govgassian would call Shaham on a speaker phone and Shaham would answer their questions. Of the money plaintiffs invested in the Santa Monica clinic, Safarian wrote checks totaling $37,400 to Silka, at least one of which

11

checks Safarian personally deposited in Silka's account. Other deposits were made to Hippocratic's account.

Safarian testified that Shaham visited the Santa Monica clinic during construction and Govgassian introduced plaintiffs to Shaham saying, "These are the investors for the clinic." Shaham testified that Govgassian told him that he had investors for the clinic, but he did not ask Govgassian who the investors were.

Shaham testified that he agreed to join Govgassian in opening the Santa Monica clinic when a doctor Govgassian had arranged to work at the clinic was no longer available. He testified that he started going to the Santa Monica clinic in December 2007. He said that he never saw Safarian at the clinic and that he did not know that Safarian was "an investor who put money in Silka's accounts." According to Shaham, he did not meet Safarian until after plaintiffs filed their lawsuit against him.

Viridiana Gilindez, the receptionist at the Santa Monica clinic, testified that during the period from September to December 2007, Shaham "visited" the clinic between 16 to 20 times. During that period, Gilindez overheard a conversation between Shaham and Safarian in which they discussed "how much money [Safarian] had invested in the clinic." Thus, Gilindez directly contradicted Shaham's testimony concerning his contacts with Safarian.

As discussed above, conspiracies are inherently difficult to prove. (*Greenwood v. Mooradian, supra,* 137 Cal.App.2d at p. 538.) Accordingly, a jury may infer a conspiracy "from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances." (*Ibid.*) Sufficient evidence was adduced at trial from which the jury could infer that Shaham conspired with Govgassian and Agadjanian to defraud plaintiffs. The evidence shows that Shaham had a long-term business relationship with Govgassian and Agadjanian; that Govgassian and Agadjanian had numerous discussions with plaintiffs about investing in the Santa Monica clinic; that Shaham participated in discussions between Govgassian and Agadjanian and plaintiffs about investing in the Santa Monica clinic; and that some of the proceeds of plaintiffs' investment in the Santa Monica clinic were deposited in Silka Enterprises, Inc.'s account.

12

Shaham's testimony that he did not know that Safarian was an investor in the Santa Monica clinic, that he started work at the clinic in December 2007 and never saw Safarian at the clinic, and that he did not meet Safarian until after the lawsuit was filed in this case, was contradicted by Safarian's testimony that Govgassian introduced her and Sanamyan to Shaham as investors during the clinic's construction and Gilindez's testimony that Shaham began work at the clinic in September 2007 and that she overheard a conversation between Shaham and Safarian in which they discussed "how much money [Safarian] had invested in the clinic."

In his supplemental letter brief, Shaham states that although it was illegal for plaintiffs to acquire a one-third ownership interest in the Santa Monica clinic because such ownership constituted the practice of medicine without a license (Bus. & Prof. Code, § 2052, subd. (a); *People v. Superior Court* (2013) 218 Cal.App.4th 492, 496), it was legal for them to acquire a one-third ownership interest in Hippocratic because Hippocratic's providing of medical practice management services only did not constitute the illegal practice of medicine.[9] The judgment must be reversed, Shaham contends, because the record does not contain evidence that he knew that plaintiffs' investment was in the Santa Monica clinic rather than in Hippocratic. That is, Shaham argues that the "problem with plaintiffs' conspiracy theory is that they failed to present any evidence that [he] knew the proposed investment was anything other than a *perfectly legal* investment in a medical practice management business." Shaham contends that he "understood" that plaintiffs were investing in Hippocratic and "the management of the new medical clinic facility." His citations to the record do not support such a claimed "understanding"—i.e., Shaham does not cite any part of the record where he testified that he understood that

---

**9** For the first time in this appeal, Shaham claims in his supplemental letter brief that the judgment also should be reversed because plaintiffs did not present sufficient evidence of an "actionable" civil conspiracy as their fraud cause of action was based on the illegal purchase of an interest in a medical practice in violation of Business and Professions Code section 2052, subdivision (a). Shaham has forfeited this claim by failing to raise it in his opening brief. (*Lewis v. City of Benicia* (2014) 224 Cal.App.4th 1519, 1533.)

13

plaintiffs had invested in Hippocratic and not in the Santa Monica clinic. The evidence discussed above demonstrates that Shaham knew that plaintiffs invested in the Santa Monica clinic and that he participated in securing that investment. As a result of this and the other evidence discussed above, there is sufficient evidence to support Shaham's liability as a conspirator in the fraudulent activity.

## II. Admission of the Comprehensive Management and Administrative Services Agreement

Shaham contends that the trial court erred in admitting the comprehensive management and administrative services agreement (agreement)—a purported May 1, 2007, agreement between Hippocratic and Silka/Salud concerning Hippocratic's providing of management, administrative, and support services to the Santa Monica clinic—because it was not authenticated. In support of his contention, Shaham relies on evidence that the agreement was created after plaintiffs invested with Govgassian, Govgassian's trial testimony that there was no management agreement between Hippocratic and Silka/Salud, Shaham's testimony that he did not sign the agreement, and Agadjanian's testimony that she was not sure if Shaham's purported signature on the agreement was Shaham's signature. The trial court did not abuse its discretion in admitting the agreement.

"A writing may be authenticated by evidence that:  [¶]  (a) The party against whom it is offered has at any time admitted its authenticity; or [¶]  (b) The writing has been acted upon as authentic by the party against whom it is offered." (Evid. Code, § 1414.)  "[T]he various means of authentication as set forth in Evidence Code sections 1410-1421 are not exclusive. Circumstantial evidence, content and location are all valid means of authentication. [Citations.]" (*People v. Gibson* (2001) 90 Cal.App.4th 371, 383.)  We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. (*Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1078.)  A trial court abuses its discretion when it rules in an "arbitrary, capricious, or

14

patently absurd manner that result[s] in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Shaham testified that Silka/Salud produced the agreement at his deposition. When plaintiffs' attorney moved to admit the agreement into evidence, Shaham's attorney objected based on lack of authentication. The trial court asked Shaham if the signature above the signature line bearing his name was his signature. Shaham denied that he had signed the agreement. The trial court sustained Shaham's authentication objection "so far."

Later, Agadjanian testified that she was familiar with Shaham's signature and that a signature on the agreement appeared to be his signature although she did not "know" that the signature was his because she was not present when the agreement was signed. At her deposition, Agadjanian testified that she had previously seen the agreement at Silka/Salud's Santa Monica office "[i]n the file where we have every other documentation." She further testified at her deposition that Shaham's signature appeared on the agreement twice and that "Harry's" (apparently Govgassian) initials appeared on the agreement once. Asked how she knew that the signatures were Shaham's signatures, Agadjanian testified that she knew and recognized Shaham's signature.

Plaintiffs' attorney moved to admit the agreement into evidence on the grounds that the agreement was kept in Silka/Salud's office, Agadjanian produced the agreement at her deposition,[10] and Agadjanian recognized Shaham's signatures and Govgassian's initials on the agreement. Shaham's attorney objected on hearsay, lack of foundation, and best evidence grounds. The trial court reserved its ruling, anticipating further testimony about the agreement.

At the close of plaintiffs' case, the trial court considered the admissibility of the agreement. It admitted the agreement under Evidence Code section 1414 on the ground that "they" had admitted the agreement's authenticity by producing it at a deposition. In

---

**10**    Agadjanian apparently was designated by Silka/Salud under Code of Civil Procedure section 2025.230 as the person most knowledgeable to testify on its behalf at a deposition.

15

addition to the trial court's stated ground, Agadjanian testified at her deposition that the agreement was kept in the documentation file at Silka/Salud's Santa Monica office, Shaham's signature twice appeared on the agreement, and Govgassian's initials were on the agreement. The trial court did not abuse its discretion in determining that the agreement had been authenticated. (*Dart Industries, Inc. v. Commercial Union Ins. Co., supra,* 28 Cal.4th at p. 1078; *People v. Rodriguez, supra,* 20 Cal.4th at pp. 9-10; Evid. Code, § 1414; *People v. Gibson, supra,* 90 Cal.App.4th at p. 383.)

## III.    Perjured Testimony

Shaham contends that plaintiffs, Govgassian, and Agadjanian gave perjured testimony that caused the jury to award excessive damages.[11] Shaham's contention fails.

Shaham claims that plaintiffs' testimony that they borrowed money to invest in the medical clinic was false because they borrowed $1.5 million against their home one year prior to their investment in the medical clinic; plaintiffs' claim that Sanamyan lost his job selling cars because he was depressed about the medical clinic was false because Sanamyan lost his job in mid-2007, the medical clinic opened in July 2007, plaintiffs knew that they would not receive a return on their investment for six months after the clinic opened, and Sanamyan lost his job due to the 2007 collapse of the automobile industry; and plaintiffs' claim that they lost their home because they borrowed money to invest in the medical clinic was false because they did not lose their home—they sold it to Safarian's brother for $550,000 to avoid repaying the $1.5 million loan, and they continued to live in the home. Shaham has failed to show that plaintiffs testified falsely—plaintiffs could have borrowed $1.5 million against their home prior to investing in the medical clinic and also borrowed money to invest in the clinic; Shaham's claim that Sanamyan lost his job due to the collapse of the automobile industry is speculation, and Sanamyan may have been depressed about his investment in the medical clinic even

---

**11**    Although Shaham states in the heading of his argument that Govgassian gave perjured testimony, he does not identify in his argument any testimony by Govgassian that he claims was false.

16

if he knew that he would not receive a return on his investment for six months after the medical clinic opened; and plaintiffs' sale of their home to Safarian's brother did not establish that they did not lose—i.e., have to sell—their house due to their investment in the medical clinic.

Shaham's claim that Agadjanian gave false testimony is unclear and does not identify the testimony he claims is false. His claim is as follows: "Shaham did not know, and his counsel did not uncover, the surreptitious manner in which Govgassian and Agadjanian had removed Shaham from Silka Enterprises, Inc. and replaced him with Agadjanian and Nabil Khalil, M.D., as directors; and then, formed a new professional corporation, Socal Healthnet, Inc., that then filed a new fictitious name, St. Luke Medical Clinic, for the very same medical clinic at 5912 Santa Monica Blvd formerly known as Salud Family Medical Clinic. [¶] The machinations of Agadjanian have only been understood with the newly discovery documents and a rigorous evaluation of those documents. The false testimony of plaintiffs and the unsubstantiated insinuations of plaintiffs' counsel that Shaham was the owner of the medical clinic, without any evidence that Shaham did anything other than provide medical services for a fixed monthly fee dovetailed very neatly into Agadjanian's testimony that, Shaham was in charge, while, in fact she was covertly doing everything she could to deprive him of 18 months of unpaid salary and to undermine his ability to see patients at the medical clinic."

Shaham bases his contention that plaintiffs and Agadjanian gave false testimony on his declaration, Luz Rodriguez's declaration (real estate agent testimony about transactions on plaintiffs' property), and exhibits to those declarations that were submitted in connection with his new trial motion—that is, evidence that was not presented at trial.[12] Shaham may not rely on that evidence to support his claim that plaintiffs and Agadjanian gave false testimony. In ruling on Shaham's new trial motion,

---

**12** We deny Shaham's motion to augment the record on appeal with corrected copies of his and Rodriguez's declarations.

17

the trial court struck the motion as untimely,[13] stating that it thus did not need to consider the merits of the motion. Alternatively, the trial court ruled that if this court held that Shaham's new trial motion was timely filed, it would sustain plaintiffs' objections to his and Rodriguez's declarations and the attached exhibits and deny the motion on the merits. Because Shaham does not challenge on appeal the trial court's alternative ruling sustaining plaintiffs' objections to his and Rodriguez's declarations and the exhibits attached thereto, he cannot rely on that evidence to show that plaintiffs and Agadjanian gave false testimony. In addition, because Shaham has not shown that plaintiffs and Agadjanian gave false testimony, he also cannot show that the jury's verdict was excessive "in light of" that perjured testimony.

## IV. Defense Counsel's Joint Representation of Shaham, Govgassian, and Agadjanian

Shaham claims that he was denied a fair trial because his attorneys, first Mary Der-Parseghian and then Alireza Taheripour, had a conflict of interest in representing him while also representing Govgassian and Agadjanian. Shaham's claim fails.

### A.    *Background*[14]

Der-Parseghian represented Shaham, Govgassian, Agadjanian, Silka/Salud, and Hippocratic until April 1, 2009, when Shaham, Agadjanian, and Silka/Salud substituted Taheripour for Der-Parseghian as their attorney. On January 7, 2011, about two months prior to the date then set for trial, Taheripour filed a motion to be relieved as counsel for Shaham, Agadjanian, and Silka/Salud on the grounds that they were not communicating

---

**13**    We address below Shaham's argument that the trial court erred in denying his new trial motion on the ground that his notice of intention to file a new trial motion and new trial motion were not timely filed.

**14**    Shaham does not set forth or discuss any of the following facts in his briefs on appeal.

18

with Taheripour or paying his bills. On February 22, 2011, Shaham filed an "Ex Parte Application for Leave to Complete Discovery Closer to Trial Date, to Shorten Time for the Deposition of Ali Teheripour, Esq., and to Order Ali Teheripour to Turn Over All Writings Related to the Action Herein." In his application, Shaham stated, "Ali Teheripour, Esq. is attempting to conceal from this Court an unlawful and prohibited conflict of interest in his dual representation of Elsagav Shaham, M.D. and Harry Govgassian and Alisa Agadjanian, the two very defendants who plaintiffs allege defrauded plaintiffs out of $250,000.00 by selling to plaintiffs shares in a medical corporation in which plaintiffs were not allowed by law to hold shares and then, after taking the money, diverted those moneys for their own use and benefit; and for which wrongful conduct plaintiffs are now attempting to hold liable Elsagav Shaham, M.D., who had no knowledge, participation, or gain from the alleged fraudulent sale."[15] By his application, Shaham sought to depose Taheripour about his representation of Shaham and the production of all documents in the action.

Shaham further stated, "The intervention of this Court is necessary to prevent defendants Harry Govgassian and Alisa Agadjanian, from perpetrating a fraud upon this Court through the use of their confederates Mary Der Parseghian, defendant Harry Govgassian's attorney and Dr. Shaham's former attorney and who arranged Dr. Shaham's representation with Ali Teheripour, Esq., by allowing Ali Teheripour, Esq. to withdraw at the last moment after fraudulently purporting to represent Dr. Shaham." He alleged that he "only understood in the last week that Ali Teheripour, Esq. falsely represented that he would represent Dr. Shaham and that he would remove Dr. Shaham from the lawsuit. In fact, Ali Teheripour, Esq. representation of Dr. Shaham was intended to lull Dr. Shaham into believing that his interests were being represented, when in fact Dr. Shaham was being set up to be the fall guy for defendants Harry Govgassian and Alisa Agadjanian."

---

**15** At the same time, Shaham claimed that he never entered an attorney client relationship with Taheripour.

19

In his supporting declaration, Shaham claimed that Der-Parseghian told him that as the sole shareholder of the Silka/Salud clinic he had to be deposed and that she would represent him at his deposition. She never asked him to sign a retainer agreement. Der-Parseghian never explained to Shaham that plaintiffs' action sought to hold him personally liable for Govgassian's and Agadjanian's actions. He believed that the action concerned Govgassian and Agadjanian who would be paying Der-Parseghian's fees. Der-Parseghian never advised him that she had a conflict in representing him and also representing Govgassian, Agadjanian, Hippocratic, and Silka. After Shaham's deposition, Der-Parseghian told him that he should have representation separate from Govgassian. Der-Parseghian introduced Shaham to Taheripour whom she said would assume his, Agadjanian's, and Silka/Salud's representation.

Shaham further declared that Taheripour did not explain to him that plaintiffs' action sought to hold him personally liable for Govgassian's and Agadjanian's actions. Taheripour did not advise him that he—Taheripour—had a conflict of interest in representing Shaham and also representing Agadjanian, and Silka/Salud. Taheripour never asked him to sign a retainer agreement. Shaham believed that Taheripour knew the latter should never have represented Shaham because there was an "irresolvable conflict" with Govgassian, Agadjanian, and Silka/Salud.

On February 22, 2011, the trial court denied Shaham's ex parte application for lack of proper notice. The next day, Taheripour requested that the trial court take off calendar his motion to be relieved as counsel for Shaham, Agadjanian, and Silka/Salud.

On February 24, 2011, Shaham filed a second ex parte application, seeking to have Der-Parseghian and Taheripour turn over their files to him, to continue the trial 120 days, and to reopen discovery. In the application, Shaham stated that when Taheripour informed him that he was withdrawing his motion to be relieved as counsel, Taheripour and Der-Parseghian offered to "share all the information in their files with [him] so that [he] could become familiar with the facts that would be presented on his behalf at the time of trial." Shaham stated that he needed to review the files to determine "whether the conflicts between himself and the other defendant(s) can be resolved so that Attorney

20

Taheripour can continue to represent both defendants, and if not, he needs time to find alternate counsel and the ability to obtain the necessary evidence by reopening discovery."

In his supporting declaration, Shaham stated, "Since neither Ali Taheripour, Esq. nor my prior attorney Mary Der Parseghian, Esq. were able to remove me from the lawsuit as promised, they should never have represented me. If I understood what I read on the court's computer, the complaint, the first amended and second amended complaints show an obvious conflict of interest between me and Harry Govgassian, Alisa Agajanian, Silka Enterprises Inc, and Salud Family Medical Clinic."

The trial court denied the second ex parte application on the ground that Shaham did not have standing to bring an ex parte application because he was represented by counsel. Shortly thereafter, on March 14, 2011, Taheripour informed the trial court that he wanted to withdraw as Shaham's counsel, but that Shaham was unwilling to sign a substitution of attorney form. The trial court's minute order stated that it had "indicate[d] that it would be willing to have a discussion in chambers with counsel and his client. [¶] Later, the Court finds that defendnat [*sic.*] Elsagav Shaham who had appeared today for trial leaves the Court without informing his attorney or the Court."

The record on appeal does not contain a subsequent substitution of attorney form substituting new counsel for Taheripour as Shaham's attorney or a subsequent motion by Shaham to disqualify Der-Parseghian prior to trial. There appears to be no other references in the record to a conflict of interest between Shaham and Der-Parseghian and Taheripour until Shaham's new trial motion. On July 19, 2012, after the jury returned its verdict, Shaham substituted himself, in pro per, for Taheripour.

### B.    *Application of Relevant Principles*

Rules of Professional Conduct, Rule 3-310(C) provides in relevant part, "A member shall not, without the informed written consent of each client:  [¶]  (1)  Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or [¶]  (2)  Accept or continue representation of more than one client

21

in a matter in which the interests of the clients actually conflict . . . ." "Attorneys who undertake to represent parties with divergent interests owe the highest duty to each to make a full disclosure of all facts and circumstances which are necessary to enable the parties to make a fully informed decision regarding the subject matter of the litigation, including the areas of potential conflict and the possibility and desirability of seeking independent legal advice. [Citation.] Failing such disclosure, the attorney is civilly liable to the client who suffers loss caused by lack of disclosure. [Citation.]" (*Klemm v. Superior Court* (1977) 75 Cal.App.3d 893, 901.)

"'It is also an attorney's duty to protect his client in every possible way, and it is a violation of that duty for him to assume a position adverse or antagonistic to his client without the latter's free and intelligent consent given after full knowledge of all the facts and circumstances. [Citation.] By virtue of this rule an attorney is precluded from assuming any relation which would prevent him from devoting his entire energies to his client's interests. Nor does it matter that the intention and motives of the attorney are honest. The rule is designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent. [Citation.]'" (*Klemm v. Superior Court, supra,* 75 Cal.App.3d at pp. 901-902.)

Shaham argues that Der-Parseghian and Taheripour had an actual conflict in representing him while also representing Govgassian and Agadjanian because Govgassian and Agadjanian "perjured themselves numerous times in their testimony," and Der-Parseghian and Taheripour failed to conduct any discovery in the case, including discovery of Hippocratic's and Salud Santa Monica's business and financial records, Govgassian's and Agadjanian's bank and financial records, and plaintiffs' business and financial records. Shaham argues that at trial neither Der-Parseghian (who no longer represented Shaham) nor Taheripour introduced evidence of Hippocratic's, Silka/Salud's, or Salud Santa Monica's financial and bank records to trace plaintiffs' investment funds

22

to show that he did not receive any of the funds, to show that Govgassian and Agadjanian received and controlled all of plaintiffs' investment funds, to show that plaintiffs' funds were used properly in connection with Salud Santa Monica, to show that Salud Santa Monica treated patients and generated receivables and to trace those receivables, and to show that Salud Santa Monica was not insolvent and plaintiffs' investment funds had not been lost.

Shaham contends that diligent representation of him required Taheripour to raise defenses that discredited Govgassian and Agadjanian. "Conceivably," he contends, Taheripour should have filed a cross-complaint on his behalf against either or both Govgassian and Agadjanian. A conflict arose, Shaham argues, when Der-Parseghian and Taheripour failed to "advocate" defenses unique to him. Relying on *Tsakos Shipping & Trading, S.A. v. Juniper Garden Town Homes, Ltd.* (1993) 12 Cal.App.4th 74, *Klemm v. Superior Court, supra,* 75 Cal.App.3d at p. 901, and *Gregory v. Gregory* (1949) 92 Cal.App.2d 343, Shaham claims that the joint representation in this case denied him a fair trial and led to a windfall for plaintiffs

The record on appeal reflects that Shaham believed, nearly a year and a half prior to the ultimate trial date, that there was an actual conflict in Der-Parseghian's former representation of Shaham, Govgassian, and Agadjanian, and in Taheripour's then present representation of Shaham and Agadjanian. Shaham filed ex parte applications for discovery concerning the conflicts and for a trial continuance to consider Taheripour's continued representation. The trial court denied the ex parte applications on timeliness and standing grounds—i.e., not on the merits. In March 2011, shortly after the trial court denied Shaham's ex parte applications, Taheripour sought to withdraw as Shaham's counsel, but Shaham refused to sign a substitution of attorney form. Thereafter, the record on appeal does not contain a substitution of attorney form substituting new counsel for Taheripour as Shaham's attorney until after trial when Shaham substituted himself, in pro per, for Taheripour. The record also does not contain a motion by Shaham to disqualify Der-Parseghian. Given Shaham's understanding of the conflicts issues well before the ultimate trial date, his stridence in addressing them initially, his

23

unwillingness to allow Taheripour to withdraw as his counsel, and his subsequent apparent abandonment of the conflicts issues including his failure to move to disqualify Der-Parseghian, Shaham cannot have proceeded to trial hoping to prevail with Taheripour as his counsel, and then claim on appeal that he received an unfair trial due to Der-Parseghian's and Taheripour's conflicts when he lost at trial. Any recourse he may have will be to proceed against them.

## V.  Notice of Intention to File a New Trial Motion and New Trial Motion

Shaham contends that the trial court erred when it denied his new trial motion on the grounds that he did not timely file his notice of intention to file a new trial motion and his new trial motion. Because the trial court also considered and denied Shaham's new trial motion on the merits—a ruling Shaham does not challenge, Shaham has not shown that the trial court erred when it denied his new trial motion even if it erred in ruling that the motion was untimely.

The trial court issued alternative rulings for denying Shaham's new trial motion and his motion for judgment notwithstanding the verdict. In its minute order,[16] the trial court ruled: "The Motions are untimely and thereby stricken and the Motions Denied on that basis and the arguments re the merits need not be considered; and if an appellate Court disagrees with the timeliness finding; the Court would evaluate the merits and adopt the reasoning of the Plaintiffs' counsel's Opposition papers as the basis to Deny both motions by Dr. Shaham.  [¶]  Further, the Court would sustain all the objections of the Plaintiffs to the Declarations of Elsagav Shaham, MD and Luz Rodriguez as well as the attached Exhibits. The Court adopts the reasoning of Plaintiffs papers in making this ruling."

Thus, although the trial court ruled that Shaham's new trial motion was untimely and struck the motion on that basis, it alternatively ruled that if the motion had been timely filed, it would have denied the motion on the merits. On appeal, Shaham

---

[16]  Shaham did not designate the reporter's transcript for the hearing as part of the record on appeal, which is a ground in itself for rejecting the claim.

24

challenges the trial court's ruling denying his new trial motion on the ground that it was not timely filed.  He does not challenge the trial court's alternative ruling denying the motion on the merits.  Because Shaham does not challenge the trial court's alternative ruling denying his new trial motion on the merits, he has failed to demonstrate that the trial court erred in denying his new trial motion.

## DISPOSITION

The judgment is affirmed.  Plaintiffs are awarded their costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.


We concur:


TURNER, P. J.


MINK, J.*

---

*        Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.